**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ROSA M. HERNANDEZ, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-04-4722 |
| | § | |
| JO ANNE B. BARNHART, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Rosa M. Hernandez ("Hernandez") and Defendant Jo Anne B. Barnhart's, Commissioner of the Social Security Administration ("Commissioner"), cross-motions for summary judgment. Hernandez appeals the determination of an Administrative Law Judge ("ALJ") that she is not entitled to receive Title II disability insurance benefits or Title XVI supplemental security income benefits. *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the opinion that Hernandez's Motion for Summary Judgment (Docket Entry No. 14) should be denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 15) should be granted, and the Commissioner's decision denying benefits be affirmed.

**I.    *Background***

Hernandez filed an application for disability insurance benefits and supplemental security income with the Social Security Administration ("SSA") on August 20, 2001, claiming that she had been disabled and unable to work since August 1, 2001. (R. 14, 579). Hernandez alleges that she

suffers from a variety of disabling conditions, including congestive heart failure,[1] pituitary tumor,[2] diabetes,[3] and vertigo.[4] (R. 37). After being denied benefits initially and on the reconsideration levels, Hernandez requested an administrative hearing before an ALJ to review the decision. (R. 37).

A hearing was held on May 20, 2004 in Houston, Texas, at which time the ALJ heard testimony from Hernandez, John C. Anigbogu, Ph.D. ("Dr. Anigbogu"), a board-certified internist, and Wallace A. Stanfill, a vocational expert ("VE"). (R. 602, 608-681). In a decision dated June 18, 2004, the ALJ denied Hernandez's application for benefits. (R. 14-18). On August 10, 2004, Hernandez appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 594-597). The Appeals Council, on October 7, 2004, denied Hernandez's request to review the ALJ's determination. (R. 5-7). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Hernandez filed this case on December 12, 2004, seeking judicial review of the Commissioner's denial of her claim for benefits. *See* Docket Entry No. 1.

---

[1] "Congestive heart failure" refers to an inadequacy of the heart so that as a pump it fails to maintain the circulation of blood, with the result that congestion and edema develop in the tissues. *See* STEDMAN'S MEDICAL DICTIONARY 646 (27th ed. 2000).

[2] "Pituitary tumor" refers to a morbid enlargement or growth of tissue on the pituitary gland, hypophysis, which is located at the base of the brain. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 865, 1896 (29th ed. 2000).

[3] "Diabetes mellitus" refers to a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance. It occurs in two major forms: type 1 diabetes mellitus and type 2 diabetes mellitus, which differ in etiology, pathology, genetics, age of onset, and treatment. *See* DORLAND'S, *supra*, at 489.

[4] "Vertigo" refers to an illusory sense that either the environment or one's own body is revolving; it may result from diseases of the inner ear or may be due to disturbances of the vestibular centers or pathways in the central nervous system. The term is sometimes erroneously used to mean any form of dizziness. *See* DORLAND'S, *supra*, at 1959.

## II.     _Analysis_

### A.     _Statutory Bases for Benefits_

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues. _See_ SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001). The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. _See_ 20 C.F.R. § 416.110. Eligibility for SSI is based upon proof of indigence and disability. _See_ 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled. _See Brown v. Apfel_, 192 F.3d 492, 495 n.1 (5th Cir. 1999); _see also_ 20 C.F.R. § 416.335. The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application. If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

20 C.F.R. § 416.335. Thus, the month following an application, here, August 2001, fixes the earliest date from which benefits can be paid. (R. 579-581). Eligibility for SSI payments, however, is not dependent on insured status. _See_ 42 U.S.C. § 1382(a).

Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. _See also_ SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both _insured_ and _disabled_, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of

3

disability prior to the filing of an application.  *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F. 2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997).  For purposes of Title II disability benefits, Hernandez was insured through the date of the ALJ's decision—June 18, 2004.  (R. 14, 17).  Consequently, to be eligible for disability benefits, Hernandez must prove that she was disabled prior to that date.

While these are separate and distinct programs, applicants seeking benefits under either statutory provision must prove "disability" within the meaning of the Act, which defines disability in virtually identical language for both programs.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a).  Under both provisions, disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).  Moreover, the law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI.  *See Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995).

B.    *Standard of Review*

1.    *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a

motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

2.     *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

5

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id*.

## C. *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05. The claimant has the burden to prove disability under the first four steps. *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236. If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving

significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. §§ 404.1572(a)-(b), 416.972.

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if his impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A). In the case at bar, when addressing the first four steps, the ALJ determined:

1. The claimant was insured during the relevant period under consideration.

2. No evidence of substantial gainful activity exists during the relevant period under consideration.

3. The claimant has the following "severe" medically determinable impairments: coronary artery disease and status-post mitral valve replacement.

4. None of the claimant's impairments, either singly or in combination, is attended by clinical or laboratory findings which meet or medically equal the criteria for any impairment set forth in Appendix 1 to Subpart P of Regulations No. 4 ("Listing of Impairments") for presumptive disability, the listed severity criteria being absent.

5. The claimant's testimony of pain, other subjective complaints, and functional limitations is not credible.

6. The claimant retains the residual functional capacity to perform medium work compromised by the inability to crawl, balance, or climbing of ladders or scaffolds and avoidance of hazards such as heights, vibration, or dangerous machinery.

7. The claimant is capable of performing her past relevant work as a home health care attendant (as performed).

8. The claimant has not been under a disability, as defined in the Act, at any time through the date of this decision.

(R. 17-18). Because the ALJ found that Hernandez could perform her past relevant work, the ALJ did not proceed to step five of the sequential evaluation process.

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Hernandez's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

**D.** _**Issues Presented**_

Hernandez contends that the ALJ failed to provide support for his conclusion that there was no objective evidence to support Hernandez's symptoms. Additionally, Hernandez claims that the ALJ failed to consider a side-effect of her medication; namely, her alleged urinary frequency of 7 to 8 times per hour. Finally, Hernandez claims that the ALJ erred by failing to evaluate the effects of her obesity. _See_ Docket Entry No. 14. The Commissioner disagrees with Hernandez's contentions, maintaining that the ALJ's decision is supported by substantial evidence. _See_ Docket Entry No. 15.

**E.** _**Review of ALJ's Decision**_

**1.** _**Objective Medical Evidence and Opinions of Physicians**_

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." _Sullivan v. Zebley_, 493 U.S. 521, 525 (1990). If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. _See id._ at 532; _see also_ 20 C.F.R. § 416.920(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); _Loza v. Apfel_, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of

> impairments, the combined impact of the impairments will be considered throughout
> the disability determination process. If we do not find that you have a medically
> severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393. The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments is equivalent to or greater than a listed impairment. *See id.* at 530-31; *Selders*, 914 F.2d at 619. The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect. *See Zebley*, 493 U.S. at 529-30. Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530. For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria. *See id.* An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria. *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *See id.* at 531 (citing 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. §§ 404.1526(a), 416.926(a). The applicable regulations further provide:

> (1)(i) If you have an impairment that is described in the Listing of Impairments in
> Appendix 1 of Subpart P of this chapter, but—
>
> > (A) You do not exhibit one or more of the medical findings specified in the
> > particular listing, or

(B)     You exhibit all of the medical findings, but one or more of the findings
        is not as severe as specified in the listing;

(ii)    We will nevertheless find that your impairment is medically equivalent to that
        listing if you have other medical findings related to your impairment that are
        at least of equal medical significance.

20 C.F.R. §§ 404.1526(a), 416.926(a).  Nonetheless, "[a] claimant cannot qualify for benefits under

the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or

combination of impairments is as severe as that of a listed impairment."  *Zebley*, 493 U.S. at 531.

Ultimately, the question of equivalence is an issue reserved for the Commissioner.  *See Spellman v.*

*Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

    A review of the medical records submitted in connection with Hernandez's administrative

hearing reveals that in July 2000, Hernandez suffered from mitral regurgitation,[5] moderate mitral

stenosis, and mild tricuspid regurgitation.  (R. 131).  An echocardiography report dated July 13, 2000,

revealed normal left ventricular function with calculated ejection fraction[6] of 60-70%, an enlarged

left atrium, moderate mitral stenosis,[7] and mild tricuspid regurgitation.  (R. 131, 135, 305, 357).  At

the time of her echocardiogram, Hernandez's height was reported as 65" and she weighed 217

pounds.  (R. 131, 305, 357).

---

[5]  "Mitral regurgitation" refers to the backflow of blood from the left ventricle into the left atrium, owing to
insufficiency of the mitral valve.  *See* DORLAND'S, *supra,* at 1555.

[6]  "Ejection fraction" refers to the fraction of blood contained in the ventricle at the end of diastole that is
expelled during its systole, or contraction.  *See* DORLAND'S, *supra,* at 708.

[7]  "Mitral stenosis" refers to a narrowing of the left mitral orifice.  *See* DORLAND'S, *supra,* at 1698.

On October 30, 2000, Hernandez presented to the emergency room complaining of chest discomfort. (R. 133). Upon physical examination, she was described as a "large obese[8] Latin American woman in no acute distress." (R. 133). Her blood pressure was 115/50; her pulse was 60 and regular. (R. 133). She reported taking medications, including Levothroid, Motrin, Vioxx, calcium carbonate, and over-the-counter fluid pills from a health food store. (R. 133). Hernandez was diagnosed with chest pain of an unknown etiology, hypopituitary syndrome,[9] and rheumatic mitral regurgitation. (R. 134). An echocardiogram revealed normal left ventricular function with calculated ejection fraction of 60%; a dilated left atrium; moderate mitral stenosis; and mild mitral regurgitation. (R. 135).

On February 6, 2001, Hernandez underwent a transesophageal echocardiogram. (R. 130). The echocardiography report noted the following: the mitral valve was moderately thickened; moderate mitral regurgitation directed posterolaterally; mild to moderate mitral stenosis; a severely enlarge left atrium; normal left ventricle; and a normal aorta. (R. 130, 279). At that time, Hernandez weighed 209 pounds. (R. 355).

In August 2001, Hernandez underwent a heart catheterization and a report was prepared by Nasser Lakkis, M.D. ("Dr. Lakkis"). (R. 282). At the time of the procedure, Hernandez weighed 216 pounds. (R. 281-282). Dr. Lakkis reported severe mitral insufficiency and mild stenosis of the mitral valve. (R. 284). Hernandez's ejection fraction was reported as 55%. (R. 284). Following her heart catheritization, Hernandez visited Harris County Hospital District complaining of pain from swelling

---

[8] "Obesity" refers to an increase in body weight beyond the limitation of skeletal and physical requirement, as a result of an excessive accumulation of fat in the body. *See* DORLAND'S, *supra*, at 1251.

[9] "Hypopituitary syndrome" refers to a diminution or cessation of function of the adenohypophysis due to surgical removal. *See* DORLAND'S, *supra*, at 866.

in her right leg. (R. 115, 351). It was noted that Hernandez needed to have mitral valve replacement surgery; however, she declined reportedly due to family problems and/or lack of insurance. (R. 90, 115, 182).

On December 12, 2001, Hernandez visited Bayshore Family Practice Center to have her thyroid checked and to check for diabetes. (R. 89). Hernandez was reported to weigh 224 pounds. (R. 89). It was noted that Hernandez's cardiologist had recommended valve replacement, but that she had not had the surgery due to lack of insurance. (R. 90). Hernandez was advised to stop taking Vioxx. (R. 89).

In September 2002, Hernandez was hospitalized at Bayshore Medical Center due to recurrent chest pains and a new onset of atrial fibrillation. (R. 147, 182-183). An echocardiogram revealed moderate mitral stenosis with moderate mitral regurgitation and moderately severe left atrial dilation; moderate tricuspid regurgitation with mild pulmonary hypertension; a left ventricular ejection fraction of approximately 50%. (R. 185). Mitral valve replacement surgery was recommended but Hernandez did not concur reportedly because she had a sick father who needed care and/or she did not have insurance. (R. 147, 182). Thus, Hernandez was transferred to Ben Taub Hospital where she had most of her work up performed. (R. 147). Her medications were adjusted and, upon discharge, her atrial fibrillation was well controlled. (R. 147).

In early October 2002, Hernandez was hospitalized in Harris County Hospital District. (R. 269). At that time her weight was reported as 219 pounds. (R. 269). A radiology report revealed cardiomegaly without pulmonary vascular congestion. (R. 247). She was referred for mitral valve replacement surgery. (R. 269). On October 24, 2002, Hernandez underwent mitral valve replacement surgery without any complications. (R. 220-222, 248-250). On November 13, 2002, it was reported

that Hernandez was recovering well and able to walk one block.  (R. 266).  On December 20, 2002, no edema was present.  (R. 265).

By January 2003, Hernandez was able to walk "several blocks."  (R. 261, 557).  An echocardiogram dated January 27, 2003, revealed normal findings, including an ejection fraction rate of 60-65%.  (R. 549).  Because Hernandez had reported limited movement in her right shoulder, she and was referred for an orthopedic consultation.  (R. 557).  In February 2003, an x-ray of Hernandez's right shoulder suggested a benign bone island of the right proximal humerus without radiographic evidence of acute fracture or dislocation; her bones and joints were otherwise within normal limits.  (R. 358-359).  An MRI also revealed a Type II acromion and mild osteophytosis with fluid in the joint; her ligaments, biceps and tendons were all within normal limits.  (R. 382).

In April 2003, Hernandez was reported as weighing 196 pounds and "feeling good."  (R. 555).  On April 28, 2003,  M. Dolan, M.D. ("Dr. Dolan") performed a physical examination of Hernandez for the SSA.  (R. 367-372).  According to Dr. Dolan, Hernandez had the following exertional limitations:  occasionally lift and/or carry (including upward pulling) 50 pounds, frequently lift and/or carry (including upward pulling) 25 pounds, stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry.  (R. 368).  Dr. Dolan noted that medical records dated January 22, 2003, indicated that Hernandez had no chest pain and could walk several blocks.  (R. 368, 557).  Dr. Dolan further reported that Hernandez's height was 64", she weighed 202 pounds, and her blood pressure was 100/72.  (R. 368).  Dr. Dolan found no postural, manipulative, visual, communicative,

or environmental limitations. (R. 369-371). Dr. Dolan concluded that Hernandez's alleged limitations were not wholly credible in consideration of the medical and other evidence. (R. 372).

On May 14, 2003, Hernandez's weight was reported as 194 pounds. (R. 554). At that time, she had neither dyspnea nor chest pain, and her ventricular rate was noted to be adequately controlled. (R. 554). In a follow-up visit on July 23, 2003, Hernandez had an irregular heart rhythm but an adequate ventricular rate was noted. (R. 553). Hernandez indicated that she "gets tired easily" and described "episodes of palpitations during the morning & night." (R. 553). At that time, no pedal edema was observed. (R. 553). Her medications were adjusted for better symptom control. (R. 553). On October 15, 2003, Hernandez described "symptomatic improvement of her palpitations," and her medication was decreased. (R. 552). In October and December 2003, Hernandez did not have shortness of breath or chest pain. (R. 380, 552).

On February 11, 2004, Hernandez indicated having "episodes of palpitations." (R. 551). On March 17, 2004, Hernandez reported "feeling tired frequently." (R. 550). Her weight was noted as "stable" at 196 pounds. (R. 550). She was advised to continue her medication regime and return for follow-up care in three months. (R. 550).

" [O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist. *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000). Medical opinions are given deference, however, only if those

opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott*, 770 F.2d at 485. Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211. It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the present case, based on the objective medical facts and opinions of physicians, there is substantial evidence in the record to support the ALJ's determination that Hernandez suffered from impairments which did not meet or equal the requirements of a listing for 12 consecutive months. Dr. Anigbogu testified that Hernandez's impairments met a medical listing (4.02 and 4.07 combined) for two months (September and October 2002). (R. 653, 656, 659-660). Hernandez recovered well after her mitral valve replacement surgery in October 2002. She reportedly was able to walk a block by November 2002 and several blocks in January 2003. (R. 266, 557). With regard to congestive heart failure, Dr. Anigbogu testified that he did not see evidence of congestive heart failure. (R. 659-660). Dr. Anigbogu observed that Hernandez only had four emergency room visits between 2000 to 2001; however, she continued to work through August 2001. (R. 14-15, 579, 665-

666). In October 2002, Hernandez's mitral valve was fixed and her pulmonary arterial systolic pressure went down from 59 to 30, which showed a significant improvement. (R. 659-660). Moreover, Hernandez's ejection fraction was normal. (R. 305, 357, 549, 661-662). Taking these factors into consideration, Dr. Anigbogu assessed Hernandez's residual functional capacity for medium work compromised by the inability to work at heights or around moving machinery. Although Hernandez's counsel cross-examined Dr. Anigbogu regarding Hernandez's fatigue, Dr. Anigbogu testified that it was highly unlikely that she had so much fatigue that she would miss three days of work per week. (R.672-674). Finally, Dr. Anigbogu testified that fatigue can be cause by many things other than a cardiac condition. (R. 674).

In reference to her shoulder pain, the x-ray and MRI from February 2003 revealed the following: a benign bone island of the right proximal humerus without radiographic evidence of acute fracture or dislocation; bones and joints otherwise within normal limits; Type II acromion and mild osteophytosis with fluid in the joint; ligaments, biceps and tendons within normal limits. (R. 358-359, 382). During the administrative hearing, Hernandez conceded that her should pain had "gone away." (R. 634).

As to the impact of Hernandez's alleged obesity on her functional limitations, although the ALJ did not reference her height and weight in his decision, he did consider such factors during the administrative hearing:

Q:      How tall are you?

A:      I'm approximately 5'6".

Q:.     Okay. And do you know what your current weight is?

A:      It fluctuates. I take a bit of medication so I'm from 185 to 190.

Q:    Okay.  And what is your normal – what do you consider your normal weight? Before you started having health problems and taking all that medication, what did you used to weigh?

A:    Actually I weighed more because I guess I retained a lot of – I was not able to function, and I had a lot of water weight.

Q:    Well, what did you used to weight before then?

A:    Probably like 20 pounds heavier.

(R. 610).  The medical records show minimal notations of Hernandez's obesity.  On a radiology report dated February 8, 2000, Hernandez's weight was not indicated, but "obesity" was noted.  (R. 346). In July 2000, Hernandez's height was reported as 65" and she weighed 217 pounds.  (R. 131).  In October 2000, Hernandez's weight was not stated, but she was described as a "large obese" Latin American woman.  (R. 133).  On December 12, 2001, Hernandez's weight was reported as 224 pounds.  (R. 89).  In early October 2002, Hernandez's weight was reported as 219 pounds.  (R. 269). From January 2003 to March 2004, Hernandez's weight fluctuated between 194 to 201 pounds.  (R. 550-557).  Hernandez's weight was noted as "stable" in March 2004 at 197 pounds.  (R. 550). None of Hernandez's treating physicians noted that her weight had any effect upon her existing impairments or limited her functioning.

The mere diagnosis of a condition, such as obesity, without resulting significant functional restrictions, is not disabling within the Act.  *See Barajas v. Heckler*, 738 F.2d 641, 644 (5th Cir. 1984). Hence, merely being obese is not *per se* disabling.  *See Long v. Apfel*, 1 Fed. Appx. 326, 332-333 (6th Cir. 2001) (finding that obesity was not a "severe" impairment even though claimant was 66 inches tall and weighed over 300 pounds).  Here, no testimony or other evidence was elicited to demonstrate

that Hernandez's weight impaired her ability to work. Nevertheless, the record indicates that the ALJ did consider her weight in reaching his decision.

2.   _**Subjective Complaints**_

The law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1981)). When a plaintiff alleges disability resulting from pain, she must establish a medically determinable impairment that is capable of producing disabling pain. *See Ripley*, 67 F.3d at 556 (citing 20 C.F.R. § 404.1529). Once a medical impairment is established, the subjective complaints of pain must be considered along with the medical evidence in determining the individual's work capacity. *See id.* It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand. *See Falco*, 27 F.3d at 164 n.18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability. *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267,

1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986).  Additionally, the mere existence of pain does not automatically bring a finding of disability.  *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.  *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be " constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  The decision arising from the ALJ' s discretion to determine whether pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522; *Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.  However, an ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record.  *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Hernandez testified regarding her complaints of pain.  (R. 644-645).  Hernandez testified that she might take one pain pill a day. (R. 644).  The ALJ' s decision indicates that the ALJ did consider objective and subjective indicators related to the severity of Hernandez' s pain:

> At the hearing, the claimant complained of heart problems and chest pain (not constant).  She alleged the inability to stand for no more than 4 hours per day, lift no more than the weight of a gallon of milk, sit for no more than 2 to 3 hours at one time (then take a 20-minute break), and walk no more than one block.  She alleged dizziness and shortness of breath when climbing stairs, lifting, or bending.  But, she reported that she is capable of performing light housework, taking care of personal needs, laundering clothes, cooking, placing dishes in the dishwasher, reading the newspaper, attending religious services, making visits, and driving an automobile.  She indicated that her hobbies involve fishing from a pier once per week.  She reported that she has taken thyroid medication for the previous 20 years and that she has anemia and arthritic pain, at times.  She reported that she had shoulder pain after

she underwent surgery; however, the pain is now gone. She denied medication side effects other than the need to go to the restroom 7 to 8 times per hour as the result of her " fluid pill." She stated that she takes pain medication at night; however, she does not have constant pain.

The undersigned weighs the credibility and consistency of the claimant' s allegations with clinical and laboratory findings, as well as with other extrinsic factors and statements, and the entire record. The undersigned finds the testimony of the claimant seems credible but not to the extent of total disability. There is simply no objective corroboration to many of her symptoms. As noted, those symptoms are not sufficient to support total disability.

While no one factor was determinative, the following factors in combination were indicative of a finding that the claimant' s subjective complaints, including pain, were not corroborated in severity, duration, and intensity as to support a finding of " total disability" as the claimant alleges:

1. The claimant' s reported activities are not shown to be consistent with her claim of total disability.

2. The claimant reports side effects from medication. There is sufficient legal reason to reject complaints of disabling side effects of medication when the claimant has not complained about these effects to her treating physician. Hajek v. Shalala, 30 F. 3d 89, 92 (8th Cir. 1994).

3. If an impairment can be reasonably controlled by medication or treatment, it cannot serve as a basis for a finding of disability. (20 C.F.R. [§§] 404.1530 and 416.930).

4. The objective medical evidence is not consistent with total disability.

(R. 16-17).

The ALJ' s findings are supported by the medical records. Hernandez' s failure to follow a physician' s prescribed treatment program is a legitimate basis for denial of benefit. *See Johnson v. Sullivan*, 894 F. 2d 683, 685 n. 4 (5th Cir. 1990). In December 2001 and, again, in September 2002, mitral valve replacement surgery was recommended; however, Hernandez declined reportedly due to family problems and/or lack of insurance. (R. 90, 115, 147, 182). " Medical impairments that

reasonably can be remedied or controlled by medication or treatment are not disabling." *Glenn v. Barnhart*, 124 Fed. Appx. 828, 829 (5th Cir. 2005) (citing *Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988); *Fraga v. Bowen*, 810 F.2d 1296, 1303-04 (5th Cir. 1987); *Adams v. Bowen*, 833 F.2d 509, 511-12 (5th Cir. 1987)). Post-mitral valve replacement surgery, in April 2003, Hernandez reported " feeling good." (R. 555). Hernandez was negative for chest pain in May, October and December 2003. (R. 380, 552, 554). Although in March 2004, Hernandez reported fatigue, her weight was noted as stable and that she was compliant with her medication; thus, she was advised to return in three months. (R. 550). Moreover, Hernandez testified that she is not in " constant pain," and her one pain medication provides her relief. (R. 644).

The Court does not doubt that Hernandez suffers from pain; however, the records do not support a finding that Hernandez' s pain is constant, unremitting, and wholly unresponsive to therapeutic treatment. *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128. Accordingly, there is substantial evidence that supports the ALJ' s finding that Hernandez' s subjective reports of pain do not rise to the level of disability.

### 3. *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> . . . only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for h[er], or whether [s]he would be hired if [s]he applied for work. . . .

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). The Commissioner bears the burden of proving that a claimant' s functional capacity, age, education, and work experience allow her to perform work

in the national economy. *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *see also Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236. If the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested. *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed. *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment. *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545. Residual functional capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work. *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1545. When a claimant's residual functional capacity is not sufficient to permit her to continue her former work, then her age, education, and work experience must be considered in evaluating whether she is capable of performing any other work. *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 404.1520. The testimony of a vocational expert is valuable in this regard, as "[he] is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145; *see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's residual functional capacity, the Fifth Circuit has looked to SSA rulings ("SSR"). *See Myers*, 238 F.3d at 620. The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. *See id.* In *Myers*, the Fifth Circuit relied on SSRs addressing residual functional capacity and exertional capacity. *See id.* In that case, the court explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work. . . . RFC involves both exertional and non-exertional factors. Exertional capacity involves seven strength demands: sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately. In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis. . . . The RFC assessment must include a resolution of any inconsistencies in the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996). The court further commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . . The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50. Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996). The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires

25

that the individual's capacity to do them on a regular continuing basis be stated. *See id.* To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis. *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In the case at the bar, the VE testified that Hernandez's past work as a nurse's aide and a home health care attendant are medium and semi-skilled. (R. 675). Additionally, the VE testified that given Hernandez's functional capacity, Hernandez was capable of performing her past work as a home health care attendant and nurse's aide (as performed). (R. 676). Hernandez contends that the ALJ failed to credit her testimony concerning urinary frequency, which she claims was a side-effect of her medication. Hernandez, however, fails to support her claim of error with any citation to the medical records regarding complaints of such side effects. Hernandez's testimony, without more, is insufficient to establish that medication side effects constituted a significant work-related limitation. *See Wren*, 925 F.2d at 125; *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989) (subjective complaints must be corroborated at least in part by objective medical evidence).

To the extent Hernandez contends that the ALJ erred because he did not make specific findings on Hernandez's ability to obtain and maintain employment because of limited endurance and the need to urinate on a frequent basis, this is not required by the law. *See Perez v. Barnhart*, 415 F.3d 457, 464-65 (5th Cir. 2005); *Dunbar v. Barnhart*, 330 F.3d 670, 671 (5th Cir. 2003); *Frank v. Barnhart*, 326 F.3d 628, 620 (5th Cir. 2003); *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002). In this regard, the Fifth Circuit has stated that "nothing in *Watson* suggests that the ALJ must make

a separate and explicit finding regarding the claimant's ability to maintain employment in every case."

*Frank*, 326 F.3d at 620. The Fifth Circuit further explained:

> . . . *Watson* required the ALJ to make a finding as to the claimant's ability to maintain a job for a significant period of time, notwithstanding the exertional, as opposed to non-exertional (*e.g.*, mental illness) nature of the claimant's alleged disability. *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms. For example, if Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination. At bottom, *Watson* holds that in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time. An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination. Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment. Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required. Frank did not establish the factual predicate required by *Watson* to necessitate a separate finding in this regard.

*Frank*, 326 F.3d at 619-20. The Fifth Circuit also has noted that subsumed within the definition of RFC is the understanding that the claimant can maintain work at the level of the RFC. *See Dunbar*, 330 F.3d at 671.

Here, Hernandez's case does not present circumstances under which the ALJ is required to make a separate finding that Hernandez is able to maintain employment over a significant period of time. In fact, as set forth *supra*, the ALJ expressly acknowledged Hernandez' s allegation of urinary frequency and rejected it as lacking veracity, stating that the medical record was void of any corroborating complaints of such medication side effects. (R. 16). Thus, contrary to Hernandez' s assertion, it appears that her ability to maintain employment was adequately taken into account by the ALJ' s RFC determination.

III.    *__Conclusion__*

In sum, the Court finds that the ALJ correctly applied the relevant legal standards in evaluating the medical evidence; in determining Hernandez' s RFC; and in assessing the credibility of Hernandez' s complaints of fatigue.  *See Greenspan*, 38 F.3d at 236.  Moreover, the record provides substantial evidence supporting the Commissioner' s decision that Hernandez is not disabled.

It is, therefore

**ORDERED** that Hernandez' s Motion for Summary Judgment (Docket Entry No. 14) is **DENIED**.  It is further

**ORDERED** that Commissioner' s Motion for Summary Judgment (Docket Entry No. 15) is **GRANTED**.  It is further

**ORDERED** that the Commissioner' s decision is **AFFIRMED**.  Finally, it is

**ORDERED** that this matter is **DISMISSED** from the dockets of this Court.

**SIGNED** at Houston, Texas, on this the 20th day of September, 2005.

Calvin Botley
United States Magistrate Judge